Michael J.D. Sweeney, Esq. (pro hac vice)
msweeney@getmansweeney.com
Matt Dunn, Esq. (pro hac vice)
mdunn@getmansweeney.com
**GETMAN & SWEENEY, PLLC**
9 Paradies Lane
New Paltz, NY 12561
Telephone:   (845) 255-9370
Facsimile:   (845) 255-8649

Jason C. Marsili
jmarsili@posner-rosen.com
**POSNER & ROSEN LLP**
3600 Wilshire Blvd., Suite 1800
Los Angeles, CA 90010
Telephone: (213) 389-6050
Facsimile: (213) 389-0663

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BARBARA FLORES, on behalf of herself and those similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SWIFT TRANSPORTATION COMPANY, et al.,**<br><br>**Defendants.** | Case No. CV 14-2900- AB-E<br><br>**DECLARATION OF MICHAEL J.D. SWEENEY IN SUPPORT OF PLAINTIFFS' UNCONTESTED NOTICE OF MOTION AND MOTION FOR COURT APPROVAL OF THEIR FLSA SETTLEMENTS**<br><br>**Hearing Date: May 2, 2016**<br><br>**Time: 10:00 a.m.**<br><br>**Assigned to: Honorable André Birotte Jr.** |

In accordance with the provisions of 28 U.S.C. § 1746, I, Michael J.D. Sweeney, hereby make this declaration:

1. I am an attorney in the firm of Getman & Sweeney, PLLC in New Paltz, New York.
2. I am one of the lawyers primarily responsible for prosecuting Plaintiffs' claims.
3. I make these statements based on personal knowledge and would so testify if called as a witness at trial.
4. Attached as Exhibit 11 is a true and correct form of *Glass v. UBS Financial Services, Inc.*, No. C-06-4068 MMC.
5. Because Court-approved notice was issued to the entire class regardless of who signed an arbitration agreement, the Parties developed a process to avoid filing consents to sue in federal court for CSRs whose claims would have to be brought in arbitration. The process provided that Plaintiffs identify each person seeking to join the action before filing a consent to sue in federal court. Swift then had an opportunity to present signed agreements for anyone seeking to join the action. Plaintiff then had an opportunity to raise any defenses to the enforcement of the agreement. Claims of CSRs who signed an arbitration agreement and did not raise a defense were not filed in federal court. Those CSRs were given the opportunity to bring their claims in arbitration. Claims of CSRs for whom Swift did not present a valid arbitration agreement were filed in this case.
6. Seventy-four CSRs brought claims in either this action or in an individual arbitration.[1] One hundred twenty-eight CSRs sought to join this action. Swift

---

[1] Two additional CSRs, Johnson and Miller, brought their claims in individual arbitrations. Their arbitration hearings were the first two scheduled. Swift settled their claims individually apart from this settlement to allow the parties time to focus on settling the balance of the arbitrations. Because Johnson and Miller's claims were

presented arbitration agreements for 95 of those 128. Of those 95, 33 did not file their claims in this Court but filed individual arbitrations. An additional 41 CSRs filed their claims in this action. Between the claims brought in arbitration and those brought here, 74 CSRs brought claims related to this litigation. The 74 CSRs who brought claims worked in seven different terminals with most working in one of Swift's customer service centers in Memphis, TN, Greer, SC, or Phoenix, AZ.

7. Although the Parties litigated the class claims on two tracks—individual arbitrations and federal court collective action—the work overlapped in substantial part. Plaintiffs conducted investigations into each Class Member's claims, whether their claims were in arbitration or federal court. Because opt-in and arbitration Class Members often worked in the same terminals, they provided crucial facts and were developed as fact witnesses for each other.

8. Discovery regarding Swift's wage-and-hour practices, CSR scheduling, CSR job duties, class member supervision, electronic records of hours worked, good faith and willfulness, company depositions, depositions of fact witnesses, depositions of supervisors at Swift's main terminals where many of the class members worked, exhibit and witness lists and summaries pre-trial briefing, and stipulations of fact all applied to claims brought in arbitration and in federal court. As part of this discovery, the Plaintiffs deposed eleven witnesses including four 30(b)(6) designees and seven managers/supervisors who worked in terminals located in Memphis and Illinois. At the time the case settled, Plaintiffs had scheduled and were prepared to take several additional depositions at locations around the country. Because Plaintiffs worked in different terminals throughout the country, Plaintiffs took discovery in many different locations. Swift also took depositions, deposing

---

resolved apart from this settlement, they are not included in the discussion in this paragraph.

four CSRs who worked in terminals located in Illinois, South Carolina, and Tennessee.

9. Thirty-three class members brought their claims in individual arbitrations before the American Arbitration Association. The Parties selected arbitrators, submitted case management plans, participated in case management conferences, and scheduled merits hearings in 23 arbitrations.[2] The hearings were scheduled to begin in June 2015 and continued into the spring of 2016. In each of the 23 cases, Claimants provided Swift with an explanation of their claims, sought and received discovery, and provided damage calculations under both the FLSA and any applicable state law. In several cases, the Parties noticed and conducted depositions and engaged in motion practice including summary judgment briefing on state law issues.

10. The Parties litigated the action in federal court as well. In addition to responding to Swift's motions to dismiss and to compel arbitration, Plaintiffs successfully moved for certification of the FLSA collective action. They also engaged in extensive discovery for the opt-in Plaintiffs in the collective action in federal court as well. Plaintiffs served discovery demands on Swift, including interrogatories, requests for documents and ESI, and requests to admit. Swift produced thousands of pages of documents and ESI, including wage records. Also, in order to resolve discovery disputes before upcoming arbitration hearings, CSRs moved to compel documents. In this case, Swift served individual discovery demands on the Plaintiff and each opt-in. While Plaintiffs objected, Swift was permitted to take individualized discovery from all of the Plaintiffs. Dkt. 88.

11. After actively and aggressively litigating this case and 33 individual

---

[2] Ten arbitrations were not assigned an arbitrator and did not have a case management plan because the Parties resolved the case before they arrived at that point.

arbitrations for more than a year, the Parties agreed to mediate the claims of all the opt-in plaintiffs and the 33 individual arbitration claimants on the eve of the first arbitration hearing. The parties conducted additional discovery to prepare for the mediation. Using that discovery combined with individual Class Member interviews, Plaintiffs' Counsel developed a damages model that calculated each Class Member's damages on a week-by-week basis.

12. On August 19, Counsel provided Swift with damage calculations showing $3,928,912 in Class damages with counsel's fees and costs listed separately. The damages represented the maximum amount each Class Member could recover if he or she prevailed at trial on every issue.

13. The Parties attended a day-long mediation on September 11, 2015 in Phoenix, Arizona, before a well-respected and experienced mediator, the Honorable Stephen H. Scott from Scott, Skelly & Muchmore, LLC. Although the Parties did not reach a settlement during the mediation, the Parties continued negotiations. Finally, after ten days of additional negotiations, the Parties agreed on a monetary value for the settlement. Over the next few months, the Parties negotiated the non-monetary settlement terms.

14. Each Class Member's recovery, whether the claims were brought in federal court or in arbitration, was individually calculated at the maximum statutory recovery based on his or her number of weeks worked, hours worked each week, rate of compensation, and any applicable state law damages in addition to FLSA damages. The settlement incorporated the risks for each claim including: 1) the risk that Swift would be successful with its affirmative defense that Plaintiffs were FLSA exempt under one of the white-collar exemptions; 2) the risk that class members would not be able to prove all the overtime hours they claimed to have worked; 3) the risk that Swift would be able to calculate back overtime wages on a half-time basis (thereby reducing back wages and liquidated damages by more than one-third); 4) the risk that

1  class members would not be able to establish a third year of FLSA liability by
2  proving that Swift willfully violated the law; 5) the risk that Swift would be
3  able to avoid liability for liquidated damages; and 6) the risk that class
4  members would not able to establish the prerequisites for state law claims.
5  The damage calculation also included a multiplier for the value of receiving
6  payment without having to wait for the litigation to take its course. The
7  damages model applied the various risk discounts to determine a fair
8  settlement on behalf of the class members. Attorneys' fees and costs were
9  provided on a separate line from the aggregate Class Member damages.

15. Ultimately, Swift agreed to pay $3,587,250 to resolve the claims of the 74 class members including the fees and costs associated with the claims. Under the allocation, Class Members recover $2,345,147.57 in back wages and statutory damages; one-third of the total settlement, $1,195,750.00, is allocated as attorneys' fees; $31,352.43 is allocated as costs (although costs of the action actually exceed that amount), and $15,000 is allocated as service payments for the Named Plaintiff in the federal court case and an arbitration claimant who acted as a class representative throughout the litigation and settlement negotiations.

16. Each Class Member received an individual settlement agreement that provided the specific amount the Class Member will receive in unpaid wages and liquidated damages, and the specific amount Swift will pay in attorneys' fees and costs apportioned to their claim. The individual Settlement Agreements were accompanied by a letter from Counsel explaining the total amount of the settlement and how the settlement was allocated among Class Members, attorneys' fees and costs, and service payments. See Ex. 1. Plaintiffs' Counsel has been in communication with all 74 Class Members and responded to any of their questions and concerns. All of the Class Members approved their recovery, the settlement terms, and the amount of

fees, costs, and service payments.

17. In return for their recovery, each Class Member agrees to release claims "based on the Company's failure to pay her overtime wages and any related claims regarding wages or classification that were raised in the Complaint in this action, including but not limited to, claims under the Fair Labor Standards Act, 28 U.S.C. § 201, et seq." See Exs. 2-5, § 4 "Release by Employee." Depending on the state in which the Class Member worked, the agreement also provides specific language for any state wage and hour claims that the Class Member released. See, e.g., Ex. 6 (releasing CA claims). The release does not apply to any claims arising after the date the Class Member signs the agreement.

18. In addition to the class' monetary recovery, Swift changed its pay practices after the Parties' settlement. As of November 1, 2015, Swift reclassified CSRs as non-exempt under the FLSA. As a result Swift now pays CSRs overtime wages when they work more than 40 hours in a workweek. The reclassification to non-exempt employees is a benefit to many of the class members who continue to work for Swift and to their co-workers.

19. Every one of the 74 Class Members agreed to the settlement and signed an individual settlement agreement. Class members who brought their claims in arbitration have already received their settlement payments and those claims have been dismissed. The opt-in Plaintiffs in this action now ask the Court to approve their settlements. Upon the Court's approval the claims administrator will distribute the remainder of the settlement fund.

20. The average Class Member recovery is $28,771.77 and on average Class Members recover almost 60% of the maximum damages that they could have received if they prevailed at trial on every aspect of their claims.

21. Actual Class Member recoveries under the settlement range from $500 to $93,960.

7

22. Named Plaintiff Flores represented the CSRs by spending considerable time working with Plaintiffs' counsel educating counsel on CSR's job duties, scheduling, and compensation, developing and then amending the class action complaint, successfully seeking FLSA class certification, challenging Swift's efforts to force class members to arbitration, modeling damage calculations, participating in discovery and settlement negotiations, and ultimately concluding a successful settlement for the class. Although trial was not necessary, she provided testimony in support of Plaintiffs' motion to certify the FLSA class and was prepared to testify at trial.

23. Although Flores had left Swift's employ when she brought this case, she used her middle name in the caption to avoid the risk of retaliation by future employers who might discover that she brought claims against a former employer through internet searches. Despite the threat, when Swift moved to compel her to file using her first name, she complied to ensure the collective action went forward. Sweeney Decl. ¶ 23. Dkt. Nos. 32 & 32-1 (Swift's Motion to Dismiss).

24. Although not a named plaintiff, Cecil acted as a class representative in many ways. She cooperated with counsel throughout the litigation with respect to her claims and those of the Class. She was among the first opt-ins to the federal action. Before her claims were sent to arbitration, she spent significant time helping Counsel understand the class claims and develop the motion to certify the FLSA collective action, and she provided supporting testimony for that action. The motion was ultimately successful and ensured that the entire class receive notice of the opportunity to join the case. She was deposed and her arbitration was one of the first scheduled for hearing. She provided extraordinary services in the settlement negotiations by making herself available throughout the process to advise Counsel on fact and settlement issues. She was the only Class Member who traveled to Arizona to participate

in the mediation with Swift.

25. Flores' retainer provided for a contingency fee of one-third the settlement amount. All the opt-in Plaintiffs signed a consent to sue that provided "I understand that the fees retained by the attorneys will be either the amount received from the defendant or 1/3 of my gross settlement or judgment amount, whichever is greater." See, e.g., Doc. 71-1. Each individual settlement included the specific amount of fees and costs attributed to that Class Member. See Exs. 2-5. Each settlement agreement was accompanied by a letter from Plaintiffs' Counsel explaining the allocation of the settlement fund including the amount of fees and costs. See Ex. 1 (Form cover letter to the Settlement Agreements). All of the Plaintiffs signed and returned their settlement agreements. See Exs. 2-5.

26. Courts throughout the country have recognized Plaintiffs' Counsel's skill and experience in FLSA litigation. See, e.g., *Bredbenner v. Liberty Travel, Inc.*, No. CIV.A. 09-1248 MF, 2011 WL 1344745, at *20 (D.N.J. Apr. 8, 2011), ("Based on the Court's experience in supervising this litigation, Counsel [Getman Sweeney] has demonstrated the utmost skill and professionalism in effectively managing these consolidated actions and bringing them to a successful conclusion."); *Banales v. Autoclaims Direct, Inc.,* 3:11 Civ. 02914, Doc. 63, p. 4 (S.D. CA, Dec. 20, 2012) ("Plaintiffs' counsel have significant experience in wage-and-hour litigation"); *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 119 (E.D. N.Y. 2011) (finding Getman & Sweeney to have "stellar" qualifications as class counsel in wage-and-hour class litigation); *Lewis v. Alert Ambulette Serv. Corp.*, 11 Civ. 442, 2012 WL 170049, *15 (E.D. N.Y. Jan. 19, 2012) ("[Getman & Sweeney] has brought to bear its considerable experience in handling class actions, and other complex litigation, particularly claims of the type asserted in the present action"); *Brumley v. Camin Cargo Control, Inc.*, CIV.A. 08-1798 JLL, 2012 WL

1019337 (D.N.J. Mar. 26, 2012) ("Both this Court and other district courts around the country have recognized Plaintiffs' counsel's experience and skill in prosecuting wage-and-hour class litigation.")

27. Counsel expended significant efforts zealously litigating this case and simultaneously litigating 33 individual arbitrations. It was only through these efforts that Counsel was able to achieve a favorable settlement for all the Class Members.

28. Plaintiffs' Counsel deposed Swift regarding its ESI. Based on the information obtained in the deposition, Counsel then sought, received, and analyzed extensive ESI for the purpose of determining the hours Class Members worked and other damages issues.

29. Plaintiffs' Counsel took substantial risk in taking on the representation. We did not receive any fees for litigating the case or receive reimbursement for their out of pocket costs. We alone undertook the financial risk of unsuccessful litigation. Under the terms of the agreement, if Plaintiffs had been unsuccessful, Plaintiffs' Counsel would not have recovered any fees or costs. We stood to gain nothing in the event the case was unsuccessful and would have lost the firm's investment in the case, overhead and salaries required to pay attorneys and paralegals with excellent credentials and experience. Any loss in compensation is even more significant because Getman & Sweeney is a relatively small firm, consisting of only six attorneys.

30. Plaintiffs' Counsel's lodestar in this case is $834,923.30. It is calculated based on Counsel's hourly rates ranging from $85 for clerical work to $625 for Dan Getman, an attorney with more than 25 years litigation of FLSA claims. A chart showing hours of work, billing rates, and total billings along with the actual time records is attached as Ex.8.

31. Getman & Sweeney's billing rates are regularly approved by federal district courts throughout the country. See, e.g., *Bredbenner v. Liberty Travel, Inc.*,

No. CIV.A. 09-1248 MF, 2011 WL 1344745, at *20 (D.N.J. Apr. 8, 2011) ("Based on the Court's experience in supervising this litigation, [Getman & Sweeney] has demonstrated the utmost skill and professionalism in effectively managing these consolidated actions and bringing them to a successful conclusion. Defendants counsel are also savvy, experienced defense attorneys in wage-and-hour cases . . . and the ability to achieve a favorable result in a case involving such formidable defense counsel is a clear indication of the skill with which class counsel handled these cases"); *Brumley v. Camin Cargo Control, Inc.*, 2:08 Civ. 01798-JLL-MAH, 2012 WL 1019337, 11 (D.N.J.,2012); *Bredbenner v. Liberty Travel, Inc.*, Civil Action Nos. 09–905 (MF), 09–1248(MF), 09–4587(MF), 2011 WL 1344745, 20-22 (D.N.J. April 8, 2011); *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 119 (E.D.N.Y. 2011); *Clark v. Ecolab*, 2010 U.S. Dist. LEXIS 47036, * 26, 2010 WL 1948198; *Martinez–Hernandez v. Butterball, LLC*, 2008 WL 8658452 (E.D.N.C. Nov. 14, 2008); *Habenicht v. Keycorp. et al.*, 1:11 Civ. 02619-DAP, Docket No. 37 (N.D. Ohio Oct. 19, 2012); *Moreno v. U.S.*, No. 05-142C (Federal Court of Claims Oct. 7, 2010); *Young v. Cooper Cameron*, 04 Civ. 5968 (S.D.N.Y. Mar. 30, 2009).

32. To date, Plaintiffs' Counsel spent a total of 1,054 attorney hours and 2,430 paralegal and clerical hours bringing the action to a successful conclusion, and additional work will be required to carry out the settlement process. This matter involved many complex factual and legal issues under both state and federal laws, litigation of a federal court FLSA collective action and 33 individual arbitrations, and sophisticated settlement negotiations. All of Counsel's work was reasonably expended in bringing this case to a successful conclusion. I have reviewed the billings for reasonableness and exercised discretion to exclude certain entries.

33. Attached as Ex. 7 is an accounting of the $31,916.15 in costs that Plaintiffs'

Counsel has incurred to date such as filing fees, service of the complaint, copies, deposition transcripts, travel, FOIA requests, postage, and mediation fees and there will be additional costs. All of these costs were necessary to the prosecution of the litigation and were incurred reasonably. We anticipate incurring additional costs related to the case.

34. Pursuant to the Court's order regarding FLSA notice, Swift identified 13 potential Class Members including the Named Plaintiff who worked in California during the applicable statute of limitations. At least seven of the 13 signed arbitration agreements and would not be eligible to be class members.

35. Each of the 13 potential class members received notice of the opportunity to bring their claims in this action. Although some responded but elected not to join the action, only three did not respond at all.

36. Ten of the 13 potential class members contacted counsel and considered bringing claims. The three others did not seek to join the case or even contact Plaintiffs' Counsel despite notice of the opportunity to join the litigation.

37. Everyone on the notice list provided by Swift was mailed notice. The notice stated "If you do not join this lawsuit, you will not be able to receive any share of any settlement or judgment that the customer service representatives may obtain." A copy of the Notice is attached as Ex. 9

38. Non-responding class members were also mailed a postcard that stated: This is a reminder that if you want to participate in the lawsuit, you must return your completed Consent to Sue form no later than 1/20/15. A copy of the postcard is attached as Ex. 10.

39. Counsel is not aware of significant media publicity about this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 31, 2016

                              */s/ Michael J.D. Sweeney*

                              Michael J.D. Sweeney
                              Getman & Sweeney, PLLC
                              9 Paradies Lane
                              New Paltz, New York 12561
                              Tel: 845.255.9370
                              Fax: 845.255.8649
                              Email: msweeney@getmansweeney.com